UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

SEAN WALKER,

                                        Plaintiff,

                    v.                                        5:04-CV-891
                                                             (J. Mordue)

COMMISSIONER OF SOCIAL
SECURITY,

                                        Defendant.

_____

APPEARANCES:                         OF COUNSEL:

OLINSKY & DI MARTINO, LLP            JAYA SHURTLIFF, ESQ.
Attorneys for Plaintiff

GLENN T. SUDDABY                     WILLIAM H. PEASE
United States Attorney for the       Assistant U.S. Attorney
 Northern District of New York
Attorney for Defendant

GUSTAVE J. DI BIANCO, Magistrate Judge

## REPORT-RECOMMENDATION

This matter was referred to me for report and recommendation by the Honorable

Norman A. Mordue, United States District Judge,  pursuant to 28 U.S.C. § 636(b) and

Local Rule 72.3(d).  This case has proceeded in accordance with General Order 18.

## PROCEDURAL HISTORY

Plaintiff protectively filed applications for Supplemental Security Income (SSI)

benefits and Disability Insurance Benefits on October 23, 2000. (Administrative

Transcript ("T") at 225.  His actual applications were filed on January 2, 2001. (T. 79-

81, 226-29). His applications were denied initially and upon reconsideration. (T. 34-37, 231-33, 40-41, 235-38).

Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") which was held on May 2, 2002. (T. 246-70). The ALJ found that the plaintiff was not disabled. (T. 19-27). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on May 27, 2004. (T. 7).

## CONTENTIONS

The plaintiff makes the following claims:

(1) The ALJ erred under 20 C. F.R. § 404.1512 when he solicited the opinion of a nonexamining medical source before recontacting plaintiff's treating physician. (Brief, p. 8).

(2) The ALJ failed to comply with Social Security Ruling 96-8p in his Residual Functional Capacity Assessment because he omitted plaintiff's environmental and postural limitations. (Brief, p. 10).

(3) The ALJ erred in using the Medical-Vocational Rules since plaintiff has additional and significant nonexertional limitations. (Brief, p. 11).

(4) The ALJ's credibility analysis did not comply with Social Security Ruling 96-7p and 20 C.F.R. § 404.1529 because he relied solely on plaintiff's statements about pain but omitted from his consideration plaintiff's statements about his other symptoms. (Brief, p. 12).

The defendant argues that the Commissioner's determination is supported by substantial evidence in the record and must be affirmed.

2

## FACTS

Plaintiff was born on April 10, 1980 and was 20 years old at the time he applied for benefits during October of 2000.  Plaintiff alleges an onset date of June 19, 2000.[1] (T. 79).  Plaintiff completed high school (T. 92) and also attended a BOCES program for automobile mechanics.  (T. 92, 256).

After high school, plaintiff had two jobs, one working at Burger King for approximately three months and another working at a hardware and building center for approximately one year. (T. 96).  His work at the building and hardware supply center involved working in the yard and carrying lumber, concrete and PVC pipes for short distances. (T. 86).  Plaintiff has a complex congenital heart condition that was repaired by surgery when he was an infant and follow-up surgery when he was approximately 3 years old.  (T. 223).  As a result, plaintiff experiences shortness of breath when he engages in strenuous activities such as basketball and vigorous competitive sports.  (T. 139).  Plaintiff's work at the hardware and building supply company involved 25 to 35 hours per week, and plaintiff reported to Dr. Daniel Kveselis in February of 2000 that he did not have any symptoms during his work.  (T. 167).

## DISCUSSION

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial

---

[1] Plaintiff's applications incorrectly state that plaintiff is claiming disability as of April 10, 1980, which is his birth date. (T. 79, 226).  The court would also point out that the Leads/Protective Filing Worksheet incorrectly states that plaintiff claims disability as of April 10, 1980. (T. 225).  However, the ALJ's decision clearly states that plaintiff is alleging disability as of June 19, 2000, the day that he stopped working. (T. 20).  Plaintiff's counsel also alleges the June 19, 2000 in her brief, and plaintiff's "Disability Report" also indicates an alleged onset date of June 19, 2000. (T. 102).

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months ....” 42 U.S.C. § 1382c(a)(3)(A).  In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step process, set forth in 20 C.F.R. §§ 404.1520 and 416.920 to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the [Commissioner] next considers whether the claimant has a “severe impairment” which significantly limits his physical or mental ability to basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations.  If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; ... .  Assuming the claimant does not have listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.  Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920.

The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that his impairment prevents him from performing his past work, the burden then shifts to the Commissioner to prove the final step. *Bluvband v. Heckler*, 730 F.2d 886, 891 (2d Cir. 1984).

1.   **Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *Rosado v. Sullivan*, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  A reviewing court may not affirm an ALJ's decision if it reasonably doubts whether the proper legal standards were applied, even if the decision appears to be supported by substantial evidence. *Johnson*, 817 F.2d at 986.  In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision. *Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984).

A court's factual review of the Commissioner's final decision is limited to the determination of whether there is substantial evidence in the record to support the decision. 42 U.S.C. § 405(g); *Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). "Substantial evidence has been defined as 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)(citations omitted).  It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 197 U.S. 229 (1938)).

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the

evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams*, 859 F.2d at 258. However, a reviewing court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). *See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983).

2.   **Medical Evidence**

_____As a result of plaintiff's birth defect in his heart, cardiac surgery which re-routed certain cardiac arteries was performed when he was an infant.  Plaintiff had a procedure known as a balloon arterial septostomy and another procedure known as a Senning repair. (T. 93, 139).  Plaintiff received extensive treatment from pediatric cardiologists at the SUNY Medical Center as a follow-up to his cardiac surgery and cardiac condition. (T. 137-167).  Plaintiff's treating pediatric cardiologist was Dr. Daniel Kveselis.  The record contains detailed reports by Dr. Kveselis of at least six visits between July of 1995 and September of 1997. (T. 137, 139, 141, 143, 145, 147).

In conjunction with these examinations, Dr. Kveselis performed numerous standard cardiac tests, including exercise treadmills, electrocardiograms, and specialized tests to measure blood flow. (T. 139-167).  The detailed reports by Dr. Kveselis show that although plaintiff became "winded" and short of breath when playing basketball (T. 141), plaintiff's health was good, his exercise treadmill results were normal (T. 137), and he was active and energetic during his high school years (T. 147, 155).  Dr. Kveselis found that plaintiff was healthy, in no distress, and could

6

participate in *all recreational activities* except vigorous contact sports or activities requiring maximum effort. (T. 143, 167-168).

During the time period between 1992 and 1996, plaintiff was also being treated by physicians at the Northern Oswego County Health Service, Inc. (T. 125-34). The Office Notes from that facility show that plaintiff had usual complaints of sore throats, muscle sprains and other temporary conditions, including complaints resulting in x-rays of his elbows and complaints about lower back pain. (T. 125-34). In November of 2000, x-rays of plaintiff's lumbar spine showed that plaintiff had no significant disc narrowing and no degenerative spurring, but did have a mild scoliosis. (T. 136). Plaintiff's treating physician at the Northern Oswego County Health Service was Dr. Patricia Chapman. (T. 88).

During May of 1996, plaintiff had a motorcycle accident and visited a hospital. (T. 207). One month later on June 19, 1996, plaintiff was examined by an orthopedic surgeon, Dr. John Cannizzaro. (T. 89). Plaintiff states that there were no further visits to Dr. Cannizzaro in connection with plaintiff's treatment after his motorcycle accident. (T. 89). Several *years* later, plaintiff complained about problems in his left knee and was examined by Dr. Tamara Scerpella.

Dr. Scerpella examined plaintiff in January of 2001, approximately 4 ½ years after his motorcycle accident on May 19, 1996. (T. 207). Dr. Scerpella found full range of motion in plaintiff's knee with some pain at extreme flexion, and some tenderness at various points. (T. 207). Plaintiff told Dr. Scerpella that he did not have swelling, locking or catching in his left knee and that Ibuprofen improved his symptoms. Dr. Scerpella believed that plaintiff might have a medial meniscal tear and

7

recommended an Magnetic Resonance Imaging (MRI) test.  The MRI test was performed in July of 2001, and the results showed ***no evidence*** of a meniscal tear. Plaintiff was referred to physical therapy for quadriceps and iliotibial band stretching as well as muscle strengthening. (T. 209).  The record, however, does not contain any reports or records showing that plaintiff attended physical therapy for his left knee.

Plaintiff claims chronic back pain as a result of the motorcycle accident. (T. 212).  The records from Northern Oswego County Health Service show that plaintiff did not visit that facility between August of 1997 and February of 2000.  During November of 2000, plaintiff complained about low back pain after bowling, and the physicians at that facility diagnosed plaintiff's condition as a low back sprain.  In December of 2000, plaintiff went to Dr. Chapman, complaining about knee and back pain. (T. 164).  Dr. Chapman found some paraspinal tenderness in his lumbar area. (T. 164).   In January of 2001, Dr. Chapman's report indicates that plaintiff's knee had improved, and his back pain had somewhat improved. (T. 166).

Plaintiff was apparently dissatisfied with the care by his pediatric cardiologist Dr. Kveselis[2] (T. 38, 112, 115), and subsequent to his application for disability, sought treatment with two other cardiologists, Dr. Charles Perla, who examined plaintiff on October 1, 2001 (T. 196), and Dr. John Altieri, who examined plaintiff during July of 2001 (T. 218).

Plaintiff was examined by Dr. John J. Altieri during July of 2001.  Dr. Altieri felt that plaintiff's case was too complicated for analysis solely by an adult

---

[2] In certain Social Security forms, plaintiff seems to claim that Dr. Kveselis was withholding information from the Social Security Administration in an effort to prevent plaintiff's eligibility for disability benefits. (T. 38, 112, 115).  Plaintiff's attorney is not making this claim in this case.

cardiologist and suggested to plaintiff that he seek the help of a pediatric cardiologist. (T. 219). Dr. Altieri performed a echocardiogram and a stress test on June 27, 2001. The results of those tests show that plaintiff had decreased exercise capacity, but did not have any provocation of angina, ischemia, or arrhythmias. Plaintiff's exercise echocardiogram was negative for inducible ischemia. Dr. Altieri discussed the results of his tests with Dr. Frank Smith, a pediatric cardiologist.

Plaintiff was examined by Dr. Charles Perla during October of 2001. (T. 196-98). Dr. Perla's report clearly states that plaintiff did not wish to return to his pediatric cardiologist. (T. 196). Upon examination, Dr. Perla found no palpitations, no precordial chest pain, no focal weakness, no hematemesis, no hematochezia, no dysuria, no hematuria, no tremor, and according to the plaintiff, shortness of breath on exertion and climbing stairs. (T. 197). Dr. Perla stated to plaintiff that Dr. Perla might need to confer periodically with a pediatric cardiologist because of the nature of plaintiff's heart problem. (T. 198). In December of 2001, Dr. Perla completed a "Cardiac Medical Source Statement" which appears to have been submitted to him by counsel for plaintiff. (T. 201-206).

In this "Cardiac" Medical Source Statement, Dr. Perla answered various questions about the plaintiff's physical capabilities and limitations. Various answers referred to plaintiff's cardiac impairment, but some of the answers stated that the limitations were from his orthopedic limitations. *Compare* T. 200-202 *with* T. 203-205. Dr. Perla stated that plaintiff's **orthopedic** impairments prevented him from sitting for more than 10 minutes, standing for more than 5 minutes at a time, and from walking for 1-1½ city blocks without resting. (T. 203). However, Dr. Perla also stated

that plaintiff did **not** need a job that permitted shifting positions "at will", but did need a job that allowed him to take "unscheduled" breaks during an eight-hour work shift. (T. 204).   However, the next question was how long the breaks would have to be, and Dr. Perla stated that it "depends on the job."  Dr. Perla stated that plaintiff could occasionally lift and carry up to 10 pounds, could never twist or crouch, could only rarely stoop or climb ladders, and could occasionally climb stairs. (T. 204).

Dr. Perla also noted that plaintiff was capable of "low stress jobs". (T. 203). One question on the form asked how often the plaintiff's cardiac symptoms were severe enough to interfere with attention and concentration. (T. 203).  Dr. Perla underlined the word "often" from the choices provided, but underneath the word, wrote "per patient." (T. 203).

Other medical evidence in the file includes examination by a consultative physician, Dr. Richard Weiskopf, on February 9, 2001.  Dr. Weiskopf issued a lengthy report and concluded that plaintiff had **no** limitation on sitting, **mild** limitations on standing and walking, and **moderate** limitations on climbing, bending, lifting, and carrying.  (T. 179).  Dr. Weiskopf also concluded that "***[i]n spite of his complaints of hand pain***," plaintiff had **good use of his hands with respect to muscle strength and fine motor activity**.  (T. 179)(emphasis added).  Dr. Weiskopf examined plaintiff's cervical spine and middle and lower spine and found no spinal tenderness or paraspinal spasm, no atrophy or sensory abnormality of the lower extremities, equal quadricep muscle strength, but limited forward and lateral flexion only to 15 degrees. (T. 178).  Dr. Weiskopf found normal flexion, extension, and rotation in plaintiff's

cervical spine .  He found no cervical or paracervical pain or spasm and found equal reflexes. (T. 178).

The Administrative Law Judge sent interrogatories to a Board-certified cardiologist, Dr. Frederic L. Ginsberg. (T. 65-68).  The ALJ advised counsel for plaintiff that she could object to the interrogatories, propose other interrogatories, make comments, and submit evidence. (T. 57-58).  Plaintiff's counsel did object to the portion of the ALJ's request which asked for a Residual Functional Capacity Assessment, and eventually the ALJ withdrew that part of his request. (T. 76).

In his report, Dr. Ginsberg found that plaintiff has a complex cyanotic congenital heart condition which had been corrected with surgical intervention.  Dr. Ginsberg noted that the surgical correction is palliation and is not a cure because plaintiff's right ventricle is functioning as the left ventricle in a normal functioning heart. (T. 223).  According to Dr. Ginsberg, the right ventricle is not as strong at pumping blood as a left ventricle.  After reviewing all of the medical evidence, Dr. Ginsberg concluded that plaintiff's impairments ***do not meet or equal any of the listings in the Social Security Regulations***.  Dr. Ginsberg found that the medical evidence supports plaintiff's claims of fatigue and shortness of breath with physical activity. (T. 223-25).

### 3.    <u>Failure to Develop the Record/Treating Physician</u>

It is well-settled that the ALJ has the duty to develop the record even when the plaintiff is represented by counsel. *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996). This duty arises from the Commissioner's regulatory obligation to develop a complete

medical record prior to making a disability determination[3] and is particularly important in a case where plaintiff is unrepresented by counsel at the time of the administrative proceedings. *See Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990); *Echevarria v. Secretary of HHS*, 685 F.2d 751, 755 (2d Cir. 1982)(where plaintiff is pro se, ALJ is under a heightened duty to probe into and explore all the relevant facts).

Plaintiff in this case was represented at the ALJ hearing, however, plaintiff argues that the ALJ should have recontacted plaintiff's treating sources when Dr. Ginsberg opined that plaintiff's cardiac condition did not meet any of the listings in the Social Security Regulations, particularly when Dr. Perla "noted symptoms consistent with [a listed impairment]." Plaintiff argues that the ALJ should have contacted Dr. Perla, and/or Dr. Altieri, and/or Dr. Kveselis to ask whether plaintiff's heart condition met or equaled any of the impairments in the Social Security Regulations.

The court would first note that Dr. Perla answered "yes" to a question in the Cardiac Medical Source Statement which asked whether the plaintiff had "marked limitation of physical activity, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though your patient is comfortable at rest?" (T. 202). This language appears in several paragraphs of one of the cardiac listings in the Social Security Regulations, although counsel cites Listing 4.04(2). 20 C.F.R. Pt.404, Subpt. P, App. 1 § 4.02(B)(2); 4.04(B); 4.04(C)(2). It is unclear to which listing counsel refers since there is no Listing 4.04(2). There is a Listing 4.04(A)(2) and a 4.04 (B), and 4.04(C)(2). Only sections 4.04(B) and

---

[3] 20 C.F. R. § 404.1512(d)-(f), 416.912(d)-(f).

4.04(C)(2) contain the language the counsel cites.  Section 4.04(B) requires that in addition to the cited symptoms, the plaintiff must also have impaired myocardial function, documented by certain clinical signs and an evaluating cardiac specialist's determination that exercise testing "would present a significant risk to the individual." Section 4.04(C) requires many other clinical signs in addition to the cited language that plaintiff does not have.

The court would point out Dr. Perla's *narrative* report states that plaintiff had a stress test in 1999 with the pediatric cardiologist, and that Dr. Altieri performed a stress echocardiogram on July 16, 2001. (T. 196).  In July of 2001, plaintiff achieved a workload of 8.5 METS in conjunction with his stress test. (T. 196).  Thus, clearly exercise testing did not present a significant risk to the plaintiff.  Although there was an impairment, "the exercise echo ... was interpreted as negative for inducible ischemia." (T. 197).  Section 4.04 first requires Ischemic Heart Disease with chest discomfort, associated with myocardial ischemia "while on a regimen of prescribed treatment" with one of many other symptoms, including signs occurring at a workload of 5 METS or less in an exercise test.  Since plaintiff achieved a workload of 8.5 METS, plaintiff did not meet the requirements of that section of the listings.  Dr. Perla referred to plaintiff's impairment as a "corrected congenital heart disease." (T. 198).

The record shows that the ALJ gave adequate notice to plaintiff's counsel of what he intended to do, and plaintiff's counsel was well aware of the purpose for the opinion requested from Dr. Ginsberg.  Plaintiff's counsel could have recontacted any of the three cardiologists mentioned to ask the same questions.  The ALJ was not under a duty to solicit *additional opinions* from the examining cardiologists, Dr.

13

Alteiri or Dr. Perla, or the treating cardiologist, Dr. Kveselis when the opinions already in the record from these doctors indicate that plaintiff's cardiac impairment did not meet or equal one of the listed impairments.

It is clear that Dr. Kveselis did not believe that plaintiff was disabled, and all of his reports very clearly show his conclusions about plaintiff's physical abilities. While Dr. Altieri and Dr. Perla did express slightly different opinions, they acknowledged that this case was complex, and they wished the assistance of a pediatric cardiologist to render a final opinion. Additionally, although Dr. Perla answered yes to whether plaintiff had the "marked" limitations cited above, this statement alone did not indicate that plaintiff had a listed impairment, given the fact that none of the medical reports demonstrated the other requirements of the listing section.

Although the regulations state that when the evidence that the Commissioner receives from a plaintiff's treating physician is "inadequate" or there is a conflict or ambiguity that must be resolved, the Commissioner will attempt to contact plaintiff's treating physician, in this case, the treating physicians' evidence was not inadequate to determine that plaintiff's impairment did not meet or equal the severity of a listed impairment. This court finds no error in the ALJ's request and receipt of Dr. Ginsberg's opinion about whether plaintiff met any of the listed impairments.

It is even questionable whether Dr. Perla is a treating physician. As the defendant points out, at the time that Dr. Perla completed his report, he had only examined plaintiff once. The regulations specifically note that part of the analysis of whether a physician is to be accorded the deference of a treating physician involves the length of the treatment relationship and the frequency of examination. 20 C.F.R.

14

§ 404.1527(d)(2)(i) and 416.927(d)(2)(i).  Given Dr. Perla's lack of lengthy

relationship with plaintiff at the time of the report and his unwarranted orthopedic

assessment, the ALJ was correct in failing to give the statements in Dr. Perla's

"cardiac" assessment controlling weight, and there was no duty to re-contact Dr. Perla

to resolve any ambiguities.

## 4.    **Residual Functional Capacity**

In rendering an RFC determination, the ALJ must consider objective medical

facts, diagnoses and medical opinions based on such facts, as well as a plaintiff's

subjective symptoms, including pain and descriptions of other limitations. 20 C.F.R §§

404.1545; 416.945. *See also Martona v. Apfel*, 70 F. Supp. 2d 145 (N.D.N.Y.

1999)(citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)).  RFC can

only be established when there is substantial evidence of each physical requirement

listed in the regulations. *LaPorta v. Bowen*, 737 F. Supp. at 183.   Furthermore, an

ALJ must specify the functions plaintiff is capable of performing, and may not simply

make conclusory statements regarding a plaintiff's capacities.  *Verginio v. Apfel*, 1998

WL 743706 (N.D.N.Y. Oct. 23, 1998); *LaPorta v. Bowen*, 737 F. Supp. at 183.

Plaintiff argues that the ALJ failed to consider plaintiff's need to avoid exposure

to extreme cold, heat, wetness, humidity, noise, fumes, etc. (Brief, p. 10).  These

restrictions come from Dr. Perla's assessment (T. 201-203).  The ALJ stated in his

decision that he gave little weight to the limitations on sitting and standing contained

in Dr. Perla's assessment form. (T. 24).  Dr. Perla is a cardiologist, and did not

examine the plaintiff for his orthopedic impairments.  Thus there could have been no

clinical findings to support Dr. Perla's orthopedic assessment.  Dr. Perla's narrative

report says nothing about any orthopedic examination, which would not be unusual since a cardiologist would not be making orthopedic assessments. (T. 196-98).

Some of Dr. Perla's findings are admittedly only based on plaintiff's statements and are inconsistent with clear evidence in the record.  For example, although Dr. Perla stated that plaintiff's cardiac condition would "often" interfere with his attention and concentration, he wrote "per patient" under the word "often." (T. 203).  There is no indication anywhere else in the record that plaintiff's cardiac impairment has that effect on plaintiff.  Dr. Perla also states that plaintiff's cardiac condition would produce dyspnea (shortness of breath) on exertion and this "... precluded his vocation at the lumbar yard."  (T. 202).  Directly above this statement is a statement that plaintiff could perform "low stress" work. (T. 202).  Even the ALJ found that plaintiff could not return to his former work.

The record shows that plaintiff's *treating* cardiologist stated that plaintiff's work in a warehouse[4] did *not produce symptoms* during his work. (T. 167).  Dr. Perla believed that plaintiff could sit for only 10 minutes because of back and orthopedic problems.  (T. 202).  Aside from the fact that Dr. Perla is not an orthopedic specialist, nor did he treat plaintiff for any orthopedic impairments, the record shows little or no treatment for "back and orthopedic problems".

Plaintiff had a motorcycle accident on May 19, 1996, and was examined by orthopedic surgeon Dr. John Cannizzaro for follow up *once* on June 19, 1996. (T. 89). Dr. Cannizzaro, according to plaintiff, "took x-ray, gave me Bacitracin ... [and] prescribed antibiotic pills." (T. 89).  Obviously, plaintiff did *not* require intensive care

---

[4] This job is sometimes referred to as being at a warehouse.

after the accident.  The record does *not* contain any other type of continuing or substantial treatment for plaintiff's back.  Dr. Perla's opinion appears to be based entirely on plaintiff's statements to him rather than a true medical assessment or the actual medical history.

In addition, plaintiff argues that the ALJ should have considered plaintiff's limitation on bending and prohibition on crouching or twisting. (T. 204, 205).  Once again, the ALJ properly rejected Dr. Perla's orthopedic assessment as unsubstantiated and inappropriate for the doctor's specialty. *See* 20 C.F.R. § 404.1527(d)(2)(ii) & (d)(5).  This court also finds no error in the ALJ's assessment of plaintiff's residual functional capacity based on the RFC assessment by a non-examining physician, Dr. Naveed Siddiqi. (T. 182-186).  Dr. Siddiqi carefully analyzed all of the medical evidence, including treatment by Dr. Chapman, Dr. Kveselis, and the consultative examination by Dr. Weiskopf, and found that plaintiff could sit for approximately 6 hours, stand for approximately 6 hours, and lift 10 pounds.  Dr. Siddiqi also noticed that the record did not contain clinical evidence to support plaintiff's "drastic" statements about plaintiff's limited abilities. (T. 182).

The RFC Assessment by the ALJ is also fully supported by the thorough examination by Dr. Richard Weiskopf. (T. 176-179).  Dr. Weiskopf found *no* limitations on sitting and only *mild* limitations on standing and walking.   He also found that plaintiff had good muscle strength and fine motor activity in his hands.  (T. 178, 179).  Dr. Perla did note limitations on plaintiff's exposure to extremes in the environment such as "extreme cold", "extreme heat", noise, fumes, hazardous machinery, dust, and odors. (T. 202).  While it is true that the ALJ must consider a

plaintiff's non-exertional impairments, there is no basis for these limitations anywhere else in the record.  The ALJ does not have to consider limitations that he finds are not supported by the record.  Finally, sedentary work is not normally done in areas where there are extreme cold, heat, moisture, humidity, odors, gases and/or hazardous machinery.  Plaintiff's arguments that the ALJ did not properly consider these limitations, therefore, are without merit.

**5.    Medical-Vocational Guidelines**

Plaintiff argues that the ALJ relied on the Medical-Vocational Rules despite the fact that plaintiff has "additional and significant nonexertional limitations."  (Brief, p. 11).  Plaintiff argues that the ALJ should have consulted a vocational expert.  However, even assuming that plaintiff has non-exertional impairments, this would ***not automatically foreclose*** the use of the Grids without a finding that those non-exertional impairments "significantly limited" plaintiff's ability to perform an exertional range of work. *Bapp v. Bowen*, 802 F.2d 601, 606 (2d Cir. 1986). .

If the plaintiff's range of work is significantly limited by his non-exertional impairments, then the ALJ must present the testimony of a vocational expert or other similar evidence regarding the availability of other work in the national economy that plaintiff can perform. *Id.*  A vocational expert may provide testimony regarding the existence of jobs in the national economy and whether a particular claimant may be able to perform any of those jobs given his or her functional limitations. *See Rautio v. Bowen*, 862 F.2d 176, 180 (8th Cir. 1988); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983).

As stated above, plaintiff's contention that he has additional and significant nonexertional limitations is ***not*** supported by substantial evidence in the record. Plaintiff points to the record at pages 204 and 205 in which Dr. Perla found that plaintiff would be restricted because of his shortness of breath, intolerance of temperature extremes, and other environmental restrictions (T. 205), and that plaintiff had restrictions on bending, crouching, twisting and climbing.  There is ***no*** substantial evidence in the record to support Dr. Perla's conclusions based on plaintiff's statements to him about intolerance to temperature extremes or environmental factors. Plaintiff's restrictions on bending, crouching, twisting and climbing would not generally be implicated in sedentary work.  The Residual Functional Capacity Assessment by Dr. Perla is based ***almost entirely upon plaintiff's statements to him*** since Dr. Perla was an examining physician and did not render treatment over any period of time.

## 7.  Pain and Credibility

"An [ALJ] may properly reject [subjective complaints] after weighing the objective medical evidence in the record, the claimant's demeanor, and other indicia of credibility, but must set forth his or her reasons 'with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.'" *Lewis v. Apfel*, 62 F. Supp. 2d 648, 651 (N.D.N.Y. 1999)(quoting *Gallardo v. Apfel*, No. 96 CIV 9435, 1999 WL 185253, at *5 (S.D.N.Y. March 25, 1999)).  To satisfy the substantial evidence rule, the ALJ's credibility assessment must be based on a two step analysis of pertinent evidence in the record.  *See* 20 C.F.R. §§ 404.1529, 416.929; *see*

*also Foster v. Callahan*, No. 96-CV-1858, 1998 WL 106231, at *5 (N.D.N.Y. March 3, 1998).

First, the ALJ must determine, based upon the claimant's objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged...." 20 C.F.R. §§ 404.1529(a), 416.929(a). Second, if the medical evidence alone establishes the existence of such impairments, then the ALJ need only evaluate the intensity, persistence, and limiting effects of a claimant's symptoms to determine the extent to which it limits the claimant's capacity to work. *Id.* §§ 404.1529(c), 416.929(c).

When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the credibility of the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3).

Plaintiff argues that the ALJ's analysis about his credibility is not supported by substantial evidence in the record since it is incomplete. Plaintiff argues that the ALJ did not consider plaintiff's statements about his heart condition, including plaintiff's shortness of breath and fatigue. The record fully supports the ALJ's finding about

plaintiff's credibility, especially in view of the fact that plaintiff applied for unemployment benefits and certified that he was able to perform work for the same time period that he was claiming disability. (T. 254-267). Plaintiff's assertion at the hearing during May of 2002 that when he applied for unemployment he did not really know much about his condition, is not credible and is contradicted by plaintiff's longstanding assertions in the record of his chronic disability because of his heart condition, contained in all of his disability statements. (T. 38, 85, 86, 93, 109, 112, 115, 20). Plaintiff's statement that he thought he was "normal" and that he only learned about his problems in 2001 from Dr. Altieri (T. 267) and only then learned that his problems were serious, is not credible since he had been treating for well over two years with his pediatric cardiologist, and had been having many specialized tests because of his cardiac surgery and his cardiac condition.

Plaintiff's assertions about his other claims of back pain and knee pain are not supported by substantial evidence in the record since plaintiff did not seek extensive medical care for his back pain. The knee pain was examined by a orthopedic specialist and the MRI results showed no tear or other problems which would account for the knee pain asserted by plaintiff. (T. 207). In addition, plaintiff reported to his primary care physician at times that his knee pain had improved. (T. 152).

Plaintiff's claims of fatigue do find some support in the medical record, but those are supported *only* at extreme exertional levels such as intense sports like basketball. There is no support whatsoever in the record for plaintiff's assertions of fatigue while sitting or standing, which are the activities required by sedentary jobs. Other statements in the record seriously challenge plaintiff's credibility such as his

extreme statements about his treating cardiologist[5] (T. 38, 112, 115).  His statements about his job for the hardware and construction supply company are inconsistent since the record shows that he has stated he was able to perform that work without serious side effects (T. 167, 168, 210), yet during his testimony, he stated he was unable to do that work without extreme fatigue and shortness of breath (T. 257).  Plaintiff has contended that his primary diagnosis is his congenital heart disease (T. 243) and indeed, that is plaintiff's main claim in this case.  His other claims are not supported by substantial evidence in the record.

The ALJ's conclusions and findings about plaintiff's credibility are fully supported by substantial evidence in the record.

**WHEREFORE,** based on the findings in the above Report, it is hereby

**RECOMMENDED,** that the decision of the Commissioner be **AFFIRMED** and the Complaint (Dkt. No. 1) be **DISMISSED.**

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d

---

[5] In disability documents, authored by plaintiff himself, he contended in very strong terms that his pediatric cardiologist has "withh[eld] information ..." about plaintiff and has "... never told SSA the truth ...."  (T. 38, 112, 115).  There is *no* support in the record for plaintiff's assertions that his treating pediatric cardiologist has withheld information or not given truthful information to the Social Security Administration.  Indeed, the record contains six extremely detailed and thorough reports from Dr. Kveselis, who is on the staff of SUNY Medical Center, a very well respected hospital attached to SUNY Upstate Medical School.  As stated above, plaintiff's counsel is not making this claim in this action.

85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

Dated: February 1, 2006

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge